UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------------X

CHRISTOPHER FOSTER,

              Petitioner,

      -against-

WARDEN, FIVE POINTS CORRECTIONAL
FACILITY

              Respondent.

**MEMORANDUM AND ORDER**
17-CV-5695 (JMA)

-------------------------------------------------------------------X

**APPEARANCES:**

Steven A. Feldman, Esq.
Feldman & Feldman
626 EAB Plaza
West Tower, 6th Floor
Uniondale, NY 11556
    *For Petitioner*

Thomas C. Costello, Assistant District Attorney
Alyson Gill, Assistant Attorney General
Timothy D. Sini, District Attorney of Suffolk County
200 Center Drive
Riverhead, NY 11901
    *For Respondent*

**AZRACK, United States District Judge:**

      On July 10, 2015, following a jury trial in state court, Christopher Foster ("Foster") was convicted of one count of Manslaughter in the First Degree and one count of Endangering the Welfare of a Child in connection with the death of his newborn son. On November 13, 2015, Foster was sentenced to twenty years and forty-two days of imprisonment on the Manslaughter count and one year of imprisonment on the Endangering count followed by five years of post-release supervision, with both sentences to run concurrently.

Foster, through counsel, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising three grounds for relief. For the following reasons, all of Foster's proffered grounds are without merit. Thus, the Court DENIES Foster's petition in its entirety.

## I. BACKGROUND

### A. **Evidence at Trial**

The following facts are taken from the evidence at trial.[1] At trial, the prosecution called sixteen witnesses, including the child's mother, Clarissa Hertlzer ("Clarissa").

#### 1. Background

Clarissa met Foster in 2010 and began a romantic relationship; approximately three months into their relationship Clarissa learned that she was pregnant with Foster's child. (Tr. 418-23.) At the time, Clarissa was receiving methadone at a clinic due to an addiction to Oxycodone; she received drug testing at this clinic and was testing clean for drugs. (Tr. 421-22.) Upon Foster learning that Clarissa was pregnant, he told her he wanted her to get an abortion and told her that she was irrational for not wanting to terminate the pregnancy. (Tr. 423-25.) When Clarissa was pregnant, Foster had a two-and-a-half-year-old son from another relationship. (Tr. 425.) Ultimately, Clarissa decided to keep the baby and when she informed Foster, he broke up with her. (Tr. 426-27.) During Clarissa's pregnancy Foster had no contact with Clarissa. (Tr. 429.)

The baby, named Jonathan Christopher ("Jonathan"), was born on August 29, 2011; Foster was not present for the birth and was informed of Jonathan's birth through a text message. (Tr. 428-29.)

---

[1] "Tr." refers to the trial transcript, People v. Foster Trial Tr., June 22-30, 2015; July 1-10, 2015, ECF Nos. 5, 5-1, 5-2, and 5-3. "S." refers to the transcript for the sentencing proceedings, People v. Foster, S. Tr., Nov. 13, 2015, ECF No. 5-4. "440.10 Hr'g. 1" refers to the transcript of the hearing pursuant to New York Criminal Procedure Law § 440.10 on June 30, 2016, People v. Foster, ECF No. 5-5. "440.10 Hr'g. 2" refers to the transcript of the continued hearing pursuant to New York Criminal Procedure Law § 440.10 on July 6, 2016, People v. Foster, ECF No. 5-6.

Both during her pregnancy and after Jonathan was born, Clarissa lived in an apartment with her mother Barbara Hertzler ("Barbara") in Ronkonkoma, New York. (Tr. 427.)

At trial, Clarissa explained that Barbara previously had a nervous breakdown and had been diagnosed with psychoaffective bipolar manic depression, a mental illness that required her to take medication that made her drowsy at night.[2] (Tr. 560.) As such, in the early days of Jonathan's life, Clarissa told Barbara that she was not to pick up Jonathan at night and that if she was woken up by Jonathan, she should wake Clarissa. (Tr. 437.)

When Clarissa was still in the hospital, Clarissa decided to allow a nurse to visit her home after the birth to check on Jonathan's well-being and to make sure there were no side effects due to her methadone use. (Tr. 430-31.) Delores Welch, a registered nurse with the Suffolk County Health Department, was tasked with visiting Clarissa's home to check on the health of Jonathan. (Tr. 76-81.) Ultimately, Welch visited the home three times. (Tr. 82-100.) The first visit was on September 9, 2011, during which Welch interacted with Clarissa and Barbara. (Tr. 82-83.) Welch checked Jonathan, found no physical injuries, and observed Clarissa bonding with Jonathan and Barbara enthusiastic about the new baby. (Tr. 83-92.) The second visit was on September 15, 2011, again both Clarissa and Barbara were present. (Tr. 92-93.) No injuries were observed on Jonathan's body and he was at a normal weight for his age. (Tr. 93-96.) The third and final visit was on September 22, 2011, during which Welch again observed no injuries or signs of infection to Jonathan. (Tr. 96-100.) During all three visits Welch performed a full check of Jonathan's

---

[2] Though Barbara had been hospitalized at times in the past, she had stabilized and was routinely taking prescribed medication. (Tr. 560.) However, following the death of Jonathan on October 11, 2011, Barbara was hospitalized on multiple occasions. (Tr. 366-67, 562.). The evidence regarding Barbara's mental illness was presented through the testimony of witnesses who knew Barbara personally. Barbara herself was not called to testify at trial by the prosecution or defense counsel. No medical records concerning Barbara's mental illness were introduced at trial.

body, including inside his mouth. (Tr. 82-100.) Foster was never present for Welch to interact with him. (Tr. 92-97.)

Foster met Jonathan when he was approximately three to four weeks old. (Tr. 438-39.) Shortly thereafter, Foster moved into the apartment with Clarissa, Jonathan, and Barbara. (Tr. 450.)

When Foster interacted with Jonathan, Clarissa noticed that at times he was rough with Jonathan, observing an incident where Foster threw Jonathan into the air as one would do with a much older baby. (Tr. 439.) During another interaction, Clarissa and Foster were in the car and Jonathan was crying, at which point Foster yelled at Jonathan to "Shut the 'F' up." (Tr. 439-40.) Clarissa felt as though she had to regularly remind Foster to be careful with Jonathan. (Tr. 440-41.)

Notwithstanding Clarissa's efforts, Foster refused to sign Jonathan's birth certificate. (Tr. 441-42.) Further, Foster failed to provide medical insurance to Jonathan, though his other son was covered through his work's medical insurance. (Tr. 442.) Although Clarissa allowed Foster to live in her apartment with her mother and Jonathan and drove Foster to his job at South Shore Materials, Foster did not provide financial support for the care of Jonathan. (Tr. 450-51.)

The sleeping arrangement at the Hertzler home was that Jonathan slept beside Clarissa's bed, in a Pack 'n Play. (Tr. 457.) Jonathan woke up frequently throughout the night and Clarissa was the one who would wake up to care for him. (Tr. 461.) Although, at first, Foster would get up when Jonathan awoke, this stopped due to an incident where Foster fell asleep with Jonathan after Foster woke up to feed him. (Tr. 461-62.) After that incident, Clarissa felt uncomfortable with Foster taking care of Jonathan during the night, so she took care of this herself. (Tr. 463.)

## 2. The Events of October 7 to October 11, 2011

On Friday October 7, 2011, Clarissa allowed Barbara to watch Jonathan for approximately three hours when she went out to dinner with Foster and other family members.  (Tr. 465-66.)  This was the first time Clarissa allowed anyone to watch Jonathan for an extended period of time.  (Tr. 466.)  When Clarissa and Foster returned, she observed Jonathan to be fine and only upon their return did Barbara take her medication.  (Tr. 467.)  On Saturday October 8 and Sunday October 9, 2011, Foster and his older son stayed with Clarissa at her apartment.  (Tr. 468.)

During the days leading up to Jonathan's death, he was having increased difficulty eating and was drooling more than usual.  (Tr. 473.)  In addition, Clarissa had observed a bruise on Jonathan's stomach, but she believed the bruise was caused during a change of Jonathan's diaper.  (Tr. 473-74.)

On October 10, 2011, Clarissa noticed a bruise near Jonathan's temple and observed that the area under Jonathan's lip appeared irritated.  (Tr. 469-71.)  Clarissa called Foster at work to ask about the injury and he said that Jonathan had hit his head on the nightstand during a feeding.  (Tr. 471.)  Clarissa planned to take Jonathan for medical attention the following day, but, as explained below, Jonathan was found dead on the morning of October 11, 2011.  (Tr. 472.)

At around 1:30 A.M. on October 11, Clarissa fed Jonathan.  (Tr. 474.)  After she fed Jonathan, she placed him in the Pack 'n Play beside her.[3]  (Tr. 483-84.)  Clarissa testified that she then fell asleep until Foster woke her up sometime between 6:00 and 6:30 A.M.  (Tr. 491.)

---

[3] Typically, Foster would return home from work at approximately 5:00 or 6:00 p.m.  On October 10, Clarissa saw Foster when he returned from work to the apartment, but he did not remain at the apartment.  At some point during the night Foster, returned to the apartment.  When Clarissa was feeding Jonathan at 1:30 A.M. Foster walked into the bedroom, but no conversation occurred, and Clarissa did not know where he had been before walking in.  (Tr. 482-83.)

At approximately 5:30 A.M. that morning, Foster called Leonard LaRosa ("LaRosa"), his boss at South Side Materials. (Tr. 149, 152, 160.) During this call, which was out of the ordinary, Foster stated that his baby was blue and was not breathing.[4] (Tr. 160-62.) Foster told LaRosa that he had given Jonathan a bottle at 3:30 A.M. (Tr. 162.) LaRosa told Foster to hang up and call 911 for immediate assistance. (Tr. 162.) Foster, however, did not call 911 or even wake Clarissa up at this time.

After feeding Jonathan at 1:30 A.M. and falling asleep, the next thing Clarissa remembers is Foster waking her up, between 6:00 and 6:30 A.M., so that she could take him to work. (Tr. 491.) After Foster woke her up, Clarissa went outside, smoked a cigarette, came inside, and laid out Jonathan's clothing. (Tr. 491.) At this point, Foster said to Clarissa, "I think there's something wrong with Jonathan." (Tr. 492.)

Clarissa rushed to Jonathan in the bedroom, noticed he was not breathing, began screaming, and Barbara entered the bedroom. (Tr. 492.) Barbara called 911 at 6:41 A.M.; the 911 operator instructed Barbara to go outside to wait for an ambulance and attempted to provide help to Clarissa and Foster in administering CPR to Jonathan. (Tr. 194-97, 492-93.) Clarissa tried to perform CPR and observed Foster to be just sitting there. (Tr. 492-93.) Approximately 70 minutes elapsed from Foster's phone call to LaRosa and the initial 911 call made by Barbara.[5]

EMT Gary Stadler responded to the 911 call, arriving at the home at 6:48 A.M. (Tr. 204-06.) Upon arrival he encountered Barbara outside directing him to an upstairs bedroom. (Tr. 207.) When EMT Stadler got to the bedroom he saw Jonathan lying lifeless on the Pack 'n Play, he

---

[4] LaRosa and Foster would speak about Jonathan at times during work; LaRosa offered Foster advice about being a new father. (Tr. 155-56.) LaRosa stated that Foster rarely called him in the morning before work and had only previously done so to tell him he was running late for work. (Tr. 160.)

[5] The record before this Court does not include a transcript of the 911 call, which was played at trial. However, it appears that, during the call, Barbara says "what did you do?" to Foster. (See Tr. 980 (prosecution's summation discussing the 911 call).)

immediately began to administer CPR.  (Tr. 207-08.)  EMT Stadler observed Clarissa to be hysterical but observed no emotional response from Foster.  (Tr. 209.)  Additionally, EMT Stadler observed a dime-sized bruise to the left temple of Jonathan.  (Tr. 210.)

Police Officer Jamie Dreschler also responded to the 911 call.  When she arrived at the home, EMTs were already there.  (Tr. 227-29.)  Officer Dreschler was directed to a bedroom inside the home by Barbara.  (Tr. 229.)  There, Officer Dreschler saw Jonathan, noticed that his skin was blue, and observed Clarissa to be hysterical.  (Tr. 229-31.)  Foster, who had no expression on his face, approached Officer Dreschler and asked if he should speak to his supervisor to call out of work.  (Tr. 232-33.)  Officer Dreschler explained to Foster that this was an emergency and he should not worry about going to work.  (Tr. 233.)

Police Officer Karen Kelly also responded to the scene and observed the EMTs taking the baby out of the home to the ambulance and transporting the baby to Stony Brook University Hospital.  (Tr. 209, 254-55.)  Officer Kelly offered Clarissa and Foster a ride to the hospital; Foster continued to express a desire to call his work supervisor, but Officer Kelly told him that he was not going to work today.  (Tr. 256.)  Officer Kelly observed Clarissa to be upset and emotional, but did not observe an emotional response from Foster.  (Tr. 257.)

Jonathan was pronounced dead at 7:23 A.M. at Stony Brook Hospital.  (Tr. 237-39, 69.)  In a private room in the hospital, Clarissa was given her deceased child to hold and law enforcement observed her to be upset and crying.  (Id.)  In contrast, Foster displayed no emotional response and at one point fell asleep in his chair while at the hospital.  (Tr. 239.)

### 3. The Investigation and Other Subsequent Events

#### i. The Police Interviews of Foster, Clarissa, and Barbara

Detective Thomas Walsh and Alfred Ciccotto of the Suffolk County Homicide Squad were assigned to investigate the incident and responded to Stony Brook Hospital. (Tr. 631-32.) Due to the nature of the injuries to Jonathan the matter was determined a homicide investigation. (Tr. 631-32.) Detective Walsh saw Jonathan deceased at the hospital and observed that he had a bruise on the left side of his head, a cut under his chin, cuts on his cheeks, petechial hemorrhage in the right eye, bruising on his stomach, and a torn upper frenulum. (Tr. 633-34.) Detective Walsh and Detective Ciccotto initially spoke with Clarissa and Foster together while still at the hospital. (Tr. 634.) When Detective Walsh spoke to Foster, Foster stated that he held Jonathan between approximately 2:30 A.M. and 3:30 A.M. and that he had no knowledge of the bruises on the baby. (Tr. 635.) Detective Walsh then spoke with Foster in a separate room at the hospital while Detective Ciccotto was going to speak separately with Clarissa. (Tr. 636-37.) Foster's statement was reduced to writing. (Tr. 637.) Foster stated the following, in pertinent part:

> For the past three days or so, Jonathan has had a cold. He has had a stuffy nose, labored breathing and drooling a lot. He had a doctor's appointment today. Up until the past three days he had been a good baby. He would wake up about two times a night, get fed and go back to sleep. The last couple of days and nights he would cry when we fed him and spit up a lot. He didn't finish his bottles and we had trouble feeding him.
>
> You could also hear his breathing was labored when he slept. Jonathan usually slept on his side or stomach in a Pack 'N Play in our room. Last night, I got home after 6:00 p.m. and Jonathan seemed fine other than his cold. During the night, Clarissa fed him at about 1:00 a.m. and put him back to bed.
>
> At about 2:30 a.m., I heard Jonathan fussing in the Pack 'N Play so I picked him up and held him till he fell back to sleep. I put him back in the Pack 'N Play, laying on his stomach, with his head turned to the side.

> I woke up at 6:30 a.m. to get ready for work and went over to check on Jonathan. I picked him up from the Pack 'N Play and noticed something was wrong. Jonathan wasn't breathing or responding to me. I freaked out as did Clarissa. Her mom called 911 and we tried doing CPR.
>
> When I am at home both Clarissa and I take care of Jonathan. When I am at work Clarissa and her mom take care of him. During the last several days I don't know of any time that Jonathan was alone with any of us. We both noticed the bruise on Jonathan's head yesterday. The only thing I can think of is he hit his head on the table next to the bed, while one of us was feeding him. He did not fall or we did not drop him at any time.

(Tr. 641-42.) Detective Walsh noticed that when Foster and Clarissa were together Foster said that they both had seen the bruise that morning, but during Foster's written statement he said they'd seen the bruise the day prior. (Tr. 644.)

Detective Walsh and Detective Ciccotto went to the Hertzler home and interviewed Barbara at approximately 7:20 P.M.; they found Barbara to be cooperative. (Tr. 645-46.)

At approximately 8:40 P.M., Detective Walsh and Detective Ciccotto went to the home of Foster's mother. There, Detective Ciccotto spoke with Clarissa inside the house while Detective Walsh spoke with Foster in the driveway. (Tr. 646.) During this interview, Foster stated that the bruise on Jonathan's head was possibly from a nighttime feeding. (Tr. 647.) After Detective Walsh told Foster that Jonathan had additional injuries to his head, Foster volunteered that Jonathan had fallen out of a swing and hit his head on the swing in the week prior to his death. (Tr. 648.) This was the first time that first Foster had mentioned Jonathan falling out of a swing. On October 12, Clarissa and Foster went to the Homicide Squad to again be interviewed by law enforcement; no arrests were made at this time. (Tr. 650.) During Detective Walsh's interview of Clarissa, she was emotional and was unable to provide any explanations for the cause of Jonathan's

injuries.  (Tr. 650-52.)  Clarissa also told law enforcement that Foster was not a "physical person," was sweet with the baby, and she believed him incapable of hurting the baby."  (Tr. 570.)

On October 13, the Detectives took the swing and Pack 'n Play for further investigation. (Tr. 652-53.)

### ii. Testimony Concerning Adrienne Scarcella and Jonathan Foster

On October 11, the day of Jonathan's death, Clarissa asked Adrienne Scarcella (Clarissa is her granddaughter's aunt) to go to Barbara's apartment and to pack away the baby items.  (Tr. 338-346.) While packing the belongings on October 12, Adrienne Scarcella found a blanket and either a onesie or washcloth that had what appeared to be blood stains on them.  (Tr. 347-48.)  Adrienne Scarcella thought that these items were suspicious, so she packed them away and kept them in a closet at her house for safekeeping.  Ultimately, when the investigation into Jonathan's death continued, Adrienne Scarcella provided the items to Clarissa, which she provided to law enforcement in June 2012.  (Tr. 350-51, 513, 720-23.)

At trial, the only witness called by the defense was Jonathan Foster, a cousin of Foster's. (Tr. 875-912.)  Jonathan Foster stated that he was present for the removal of the baby's items. According to Jonathan Foster, Barbara was present at the apartment that day and stated to him "Jonathan, sometimes I hear voices to kill."  (Tr. 877-97.)  Jonathan Foster conceded on cross-examination that he had not informed law enforcement of Barbara saying this.[6]  (Tr. 905-07.)

---

[6] During her testimony, Adrienne Scarcella was cross examined regarding Barbara's statements that she wanted to kill.  Defense counsel ask Scarcella the following question "Did you know that she was hospitalized after the baby died, and she said she wanted to kill people?"" (Tr. 366.)  In response, Adrienne Scarcella indicated that she believed Barbara did not mean it and it did not concern her, responding "Yes, I did.  But you know what? A lot of people, when they are distraught, a lot of people get angry and say the same thing."  (Tr. 366-67.)

### iii. The Interactions Between Clarissa and Foster After Jonathan's Death

Following the death of Jonathan, Clarissa repeatedly asked Foster about what had happened, but Foster kept putting off the conversation, saying that they could talk about it at a later time. (Tr. 503-05.) Foster told Clarissa conflicting stories about the discovery of blood on one of Jonathan's spit-up rags, first saying that he cut himself shaving and later saying it was from Jonathan's circumcision wound opening. (Tr. 505-10.) Clarissa and Foster eventually broke up in 2012. (Tr. 509.)

### iv. The Forensic Evidence and Medical Examiner Testimony

Multiple items from the home, related to the incident, were analyzed at the Suffolk County Crime Laboratory, including baby blankets, bed sheet, crib liner, a wash cloth, and a onesie. (Tr. 378-81.) To summarize, blood stains were found on these items, a DNA profile was created from the blood samples for comparison purposes, and Jonathan was deemed a match to the blood recovered from the items from the bedroom. (Tr. 384-85.)

An autopsy of Jonathan was performed that included a full list of the injuries discovered on Jonathan's body at the time of his death:

> [T]here was a bruise on the left side of the head, the forehead, about a quarter of an inch, a little bit above and behind the left eyebrow.
>
> There was a faint bruise, that was covering the hair, that was in front of the left ear, that was on the left side.
>
> There was some swelling of the scalp, that Dr. DeJoseph could feel . . . There were multiple scrapes or abrasions that were on the tip of the nose and over the sides of the nose . . . up to about a quarter of an inch.
>
> There were some very small bruises, less than a sixth of an inch, that were on the eyelids of the right upper and lower eyelids, as well as one single one that was on the left upper eyelid.

There was a line of some tiny pinpoint scabs, some of which resembled acne, that was on the right side of the cheek line.

There was an abrasion, or a scrape, that was right where the lip meets the chin.  It was about a half an inch by an 8th of an inch.

There was an abrasion, or a scrape, that was right at the corner, on the left side of the mouth.

There was – on the undersurface of the chin . . . about a little less than a quarter of inch scrape, that was on the left side of the undersurface of the chin, and there was also two smaller ones, that was right in the middle, about a 16th and an 8th inch, that were right here, under the tip of the chin.

Additionally, there was a tear of the frenulum, the upper frenulum.  That is the mucous membrane, the band . . .  If you pull up your upper lip, there is a ridge of tissue that connects the upper lip, the mucous membrane of the upper lip, to the gum line over the upper jaw.  There was a tear in the frenulum, that was a little less than a quarter of an inch.  And then there was also a small bruise that was on the mucous membrane of the left side of the, upper left.

There were also two small bruises on the back of the neck, just a little bit below the bottom of the ear, that were both about an eighth of an inch just at above the hairline area.

*         *         *

[T]here was an area about an inch and a half, by an inch, of small scrapes right around the front of the chest and the midline, right over where the sternum would be.

There was also some . . . small bruises, they range from about an eighth of an inch up to about three-quarters of an inch, on the abdominal wall, and there were - - there were two on the right side of the abdomen, one above and one below the belly button, and then there was one on the left side, above the belly button.

*         *         *

[O]n the extremities, there were two bruises on the backs of the legs . . .  a little bit above the ankles . . .  On the upper extremities, there were a few bruises that were on the - - on the little pinky side, of the right forearm.  There was one that was about a quarter of an inch, that was closer to the elbow.  One that was about an eighth of an

> inch, that was closer to the ribs. Then there was also some small, very small bruises, on the front of the left forearm.
>
> . . . [T]here were some tiny scabs. They were on the knuckles of the second index and the middle finger.

(Tr. 769-73.)

According to the testimony of Doctor Michael Caplan, the Chief Medical Examiner at the Suffolk County Medical Examiner's Office, the bruises to Jonathan's chest may have been caused by the attempts to perform CPR.[7] The tear to Jonathan's frenulum—which could have caused him to be fussy, to spit up, and to drool—was likely was a few days old. (Tr. 800–04, 855.) This tear could have been caused by direct blunt force such as a punch or a blow or by forcing a bottle into the baby's mouth. (Id.)

Dr. Caplan, however, opined that the bruise to Jonathan's left temple and the injuries to the back of his head occurred shortly before his death. (Tr. 795-97.) In Dr. Caplan's medical opinion, "the cause of death was blunt impact to the head, with fractures of the skull and injuries of his brain." (Tr. 820.) Dr. Caplan opined that death from these injuries likely occurred sometime between a few minutes and two hours after these injuries were inflicted. (Tr. 821, 848–59.) Dr. Caplan also opined that if the fatal injuries were delivered at 1:30 A.M.—when Clarissa testified she fed Jonathan—those injuries would have been obvious by 3:00 to 3:30 A.M, the time at which Foster stated he woke up with Jonathan. (Tr. 836.)

## B. Foster's Trial and Conviction

Foster was ultimately arrested on October 7, 2013. (Tr. 724.) He was tried in New York Supreme Court, Suffolk County, starting on June 22, 2015. (Tr. 45.) At trial, the prosecution

---

[7] The autopsy of Jonathan was performed by Dr. Maura DeJoseph, who at the time of trial was no longer working at the Suffolk County Medical Examiner's Office and did not testify at trial. (Tr. 759.) Dr. Caplan testified after reviewing the documentation related to the autopsy of Jonathan. (Tr. 760.)

presented the testimony of Clarissa, LaRosa, Conklin, Delores Welch, multiple members of law enforcement who played a role in the investigation of this matter, Dr. Michael Caplan, and other expert witnesses involved in the medical determinations and the DNA analysis. (Tr. 76-874.) Jonathan Foster, a cousin of Foster's, was the only witness called by the defense.

At trial, defense counsel argued at trial that "no evidence [ ] shows that Christopher Foster hurt Jonathan Hertzler" and stressed that that law enforcement never adequately investigated Barbara as a potential suspect. (Tr. 932-69.) In addition, defense counsel attacked all areas of the prosecution's case, arguing that: (1) though Foster was not supportive of Clarissa's pregnancy it does not follow that he murdered Jonathan (Tr. 941); (2) the jury should doubt the timeline of the call to LaRosa due to the passage of time and the lack of phone records (Tr. 943); (3) Foster's lack of emotional response is consistent with being in shock because of a traumatic incident (Tr. 944-45); (4) Clarissa and Barbara were Jonathan's primary caretakers and Clarissa was a drug user who suffered from depression through her life (Tr. 946-47); (5) Clarissa repeatedly told law enforcement that she did not believe Foster capable of hurting Jonathan (Tr. 948-50); (6) Adrienne Scarcella hid the bloody blankets to protect Clarissa and Barbara (Tr. 953-54); (7) Barbara was immediately discounted as a suspect by law enforcement even though she shared the home and suffered from mental illness (Tr. 957); and (8) Foster was extensively interviewed by law enforcement and maintained he would never hurt Jonathan (Tr. 965-66). Ultimately, on July 10, 2015, Foster was convicted of Manslaughter in the First Degree and Endangering the Welfare of a Child. (Tr. 1136-38.) Foster was acquitted of Murder in the Second Degree. (Tr. 1136-38.)

On November 13, 2015, Foster was sentenced to a term of twenty years and forty-two days incarceration for the manslaughter count to run concurrent to a term of one-year incarceration for the endangering count, followed by five years of post-release supervision. (S. 11-12.)

## C. Post-Conviction Proceedings

### 1. The Direct Appeal

On October 31, 2015, Foster appealed his conviction to the Second Department of the New York State Appellate Division. On appeal, he argued: (1) that the prosecution failed to meet its burden of proof beyond a reasonable doubt and the resulting conviction was against the weight of the evidence; (2) that certain testimony from Clarissa in which she opined about Foster's guilt deprived Foster of his Fourteenth Amendment right to a fair trial; and (3) the trial court's preclusion of defense counsel's cross-examination of Clarissa concerning findings made in a Family Court proceeding violated his right to confront Clarissa. (See Def.'s App. Br., Oct. 31, 2015, at 46-103, ECF No. 5-7.)[8]

The Second Department affirmed Foster's conviction on October 5, 2016, rejecting Foster's claims in their entirety. People v. Foster, 143 A.D.3d 736, 736-37 (N.Y. App. Div. 2d Dep't 2016). The court found that the prosecution met its burden of proof and there was sufficient evidence presented at trial to uphold Foster's conviction, "accord[ing] great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor." Id. at 736. In addition, the court rejected Foster's argument that the trial court erred in precluding portions of defense counsel's cross-examination and determined that Foster "failed to preserve for appellate review his contention that he was deprived of his constitutional right to confront witnesses against him." Id. The Second Department added that the "remaining contention," which referred to Foster's fair trial challenge concerning Clarissa's testimony, "is without merit." Id. at 737.

On December 5, 2016, the New York Court of Appeal denied Foster's request for leave to appeal. People v. Foster, 28 N.Y.3d 1124 (N.Y. 2016).

---

[8] The Court uses the pagination assigned by the electronic case filing system for ECF No. 5-7.

## 2. The Section 440.10 Motion

Foster filed a motion pursuant to Section 440.10 of the New York Criminal Procedure Law on March 26, 2016. (See Def.'s 440.10 Mot., Mar. 26, 2016, at 1-6, ECF No. 5-8.)[9] In the 440.10 motion, Foster argued that newly discovered evidence, specifically information from the Hertzlers' neighbor Carol Stalhut ("Stalhut"), demonstrated that Foster was actually innocent and he requested a hearing to resolve this issue. Id. A hearing was ordered and held on June 30 and July 6, 2016 in the Supreme Court of Suffolk County, during which the court heard testimony from Stalhut. (See 440.10 Hr'g. 1, 6-41, 440.10 Hr'g 2, 3-51.)

Stalhut explained that she was a neighbor and friend of Barbara's and knew that Barbara suffered from mental illness. (440.10 Hr'g. 1, 7-9.) Stalhut stated that on February 11, 2016, she was at Barbara's apartment assisting her with her prescription medication and observed Barbara to be lucid. (440.10 Hr'g. 1, 9-10.) While at the apartment, Barbara asked Stalhut if she could tell her a secret and then said that on October 11, 2011, "in the middle of the night," she observed Clarissa holding a blanket over Jonathan's face, "suffocating" him, and that she appeared to be applying pressure; Barbara communicated this pressure through the use of "hand gestures." (440.10 Hr'g. 1, 10-12.) Stalhut stated that Barbara told Clarissa to take the blanket off so Jonathan could breath and Clarissa did so. (440.10 Hr'g. 1, 12.) Barbara told Stalhut that Clarissa did not seem like herself and she was afraid that Clarissa was using drugs. (440.10 Hr'g. 1, 12.) Barbara also stated that later that night she was awakened again and checked on Jonathan and he looked horrible. (440.10 Hr'g. 1, 13.)

Stalhut then observed Barbara begin to act in an erratic manner, making Nazi salutes towards the window and gesturing towards things that were not there, and Stalhut called 911 to

---

[9] The Court uses the pagination assigned by the electronic case filing system for ECF No. 5-8.

get help.  (440.10 Hr'g. 1, 15-18.)  According to Stalhut, Barbara was then committed to a hospital for a month.  (440.10 Hr'g 2, 37.)

According to Stalhut's testimony, the following day she wrote down what happened, called 911, and gave a letter with the above-mentioned information to the police, who informed her that the case was closed as Foster had confessed.[10]  (440.10 Hr'g. 1, 15-20.)  Stalhut also testified that she had sent her written statement in a letter to the Suffolk County District Attorney's Office and to Foster at his place of incarceration.  (440.10 Hr'g. 1, 22-29.)

During the hearing, Stalhut also explained that she had another conversation with Barbara on March 14, 2016, while wearing a recording device at the request of a defense investigator. (440.10 Hr'g. 2, 19-24, 36.)  This recording was played at trial and Barbara testified about that conversation.  (Id.; see also Respondent's Mem. at 7 (quoting transcript of recording).)  During her testimony at the hearing, Stalhut also confirmed that Barbara never told her that she saw Clarissa kill Jonathan.  (440.10 Hr'g. 2, 36.)

During the prosecution's cross-examination of Stalhut, Barbara's multiple struggles with mental stability were addressed.  (440.10 Hr'g. 2, 3-5.)  In addition, through the cross-examination it became clear that there were some discrepancies between the conversations on February 11 and March 14.

Following Stalhut's testimony, the Government called no witnesses, but introduced portions of Barbara's medical records from prior hospitalizations, Jonathan's autopsy report, and the transcript of Dr. Caplan's expert trial testimony.  (440.10 Hr'g. 2, 53-55.)  Barbara did not testify during the hearing.

---

[10]  Although Foster never confessed to killing Jonathan, by February 2016, he had already been convicted and sentenced.

Following the hearing, the Supreme Court of Suffolk County denied Foster's 440.10 motion. (See Court Order Denying Def.'s 440.10 Mot., Oct. 7, 2016, at 99-102, ECF No. 5-8.)[11] The court found:

> [T]he newly discovered evidence advanced by the defendant, taking the form of a hearsay statement offered by Carol Stalhut, is refuted by the credible evidence in the record. Moreover, the statement is contradicted by the purported declarant, Barbara Hertzler suffered a severe psychotic episode that resulted in a lengthy stay in a psychiatric hospital. Accordingly, any statement Barbara Hertzler may have uttered during such a mentally imbalanced state is suspect at best and cannot be considered reliable. Finally, the statement offered by Carol Stalhut is wholly inconsistent with the medical and scientific evidence presented at trial by the medical examiner.

(Court Order Denying Def.'s 440.10 Mot. at 101.) The court emphasized that because the medical evidence at trial concluded that Jonathan's death was a result of blunt force trauma, Barbara's alleged statements regarding suffocation would not have affected the verdict. (See Court Order Denying Def.'s 440.10 Mot. at 102.)

On January 24, 2018, the Second Department affirmed the denial of Foster's 440.10 motion, stating that "[t]he court properly found that the defendant failed to meet his burden of establishing that the newly discovered evidence was of such a character as to create a probability that, had it been received at trial, the verdict would have been more favorable to the defendant." People v. Foster, 157 A.D.3d 901, 901 (N.Y. App. Div. 2d Dep't 2018). Thereafter, on April 23, 2018, the New York Court of Appeals again denied Foster's request for leave to appeal this decision. People v. Foster, 31 N.Y.3d 1013 (N.Y. 2018).

---

[11] The Court uses the pagination assigned by the electronic case filing system for ECF No. 5-8.

### 3. The Instant Petition

Foster filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on September 28, 2017.[12] He asserts the following grounds for relief: (1) that the prosecution failed to meet their burden of proof beyond a reasonable doubt at trial and the resulting conviction is against the weight of the evidence; (2) portions of Clarissa's testimony deprived Foster of a fair trial; and (3) the trial court's preclusion of certain cross-examination of Clarissa violated Foster's right to confront the witness. (See Pet. at 5-8, 35-59, ECF No. 1.)[13] Foster's petition notes that, upon information and belief, both Clarissa and Barbara are now deceased. (Pet. at 16.)

For the reasons discussed below, all of Foster's claims are without merit. Thus, the instant petition is DENIED in its entirety.

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner may file a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must demonstrate: (1) the exhaustion of state

---

[12] The Court notes that Foster filed an additional habeas petition on October 20, 2017. <u>See</u> ECF No. 2. The Court has reviewed this subsequent filing, observing that it contains the same claims for relief as the first petition. Therefore, this decision addresses all arguments contained in the second habeas petition.

[13] The Court uses the pagination assigned by the electronic case filing system for ECF No. 1.

remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions. See id. § 2254.

### 2. Exhaustion

Generally, a court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Therefore, the petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered. Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts of the claim's federal nature.'" Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

Where the petition is a "mixed petition," containing both exhausted and unexhausted claims, the court can deny the unexhausted claims if they are plainly meritless. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Ortiz v. Marshall, No. 08-CV-8815, 2009 WL 3170300, at *7 (S.D.N.Y. Sept. 30, 2009) ("Federal courts retain the discretion to deny a petition including unexhausted claims on the merits when it deems those claims to be patently frivolous.").

### 3. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the

judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the petitioner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012).  This procedural bar applies even if the state court addressed a claim's merits in the alternative, but decided that claim on independent procedural grounds.  Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).

"The concepts of procedural bar and exhaustion often interact in an important way." Dominguez v. Rock, No. 12-CV-3269, 2016 WL 542120, at *5 (E.D.N.Y. Feb. 9, 2016).  "If a § 2254 petitioner has failed to present a claim to a state court but can no longer do so – for example, if the time to file a state-court appeal has passed – then that claim is considered procedurally barred rather than unexhausted." Id. (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999)); Lloyd v. Walker, 771 F. Supp. 570, 574 (E.D.N.Y. 1991) (noting that "[w]hen a petitioner has not properly presented his claim to a state for consideration on the merits, but it is clear that the state court would hold the claim procedurally barred, . . . the exhaustion requirement is satisfied," but, nonetheless, the petitioner is barred from litigating the merits of that claim in federal habeas proceedings) (internal quotation marks and citation omitted).

To overcome a procedural bar a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  To

demonstrate cause, a petitioner must put forth that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials … made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). A petitioner may also satisfy the cause requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016). Generally, however a petitioner cannot invoke this ground unless he first asserted the same independent Sixth Amendment ineffective assistance claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 466, 451-52 (2000).

To satisfy the prejudice requirement, the petitioner must demonstrate that ground invoked by the petition to establish cause not only "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage". United States v. Frady, 456 U.S. 152, 170 (1982).

Even if a petitioner cannot establish cause and prejudice, a federal court may excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result. A petitioner can overcome a procedural bar by showing "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)). To prevail, the petitioner must put forth "new reliable evidence … that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

### 4. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.SC. § 2254(d). The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam)). This standard is "'difficult to meet.'" White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014). A

petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389.

**B. Claims for Relief**

As mentioned above, Foster seeks habeas relief on three separate grounds: (1) that the prosecution failed to meet their burden of proof at trial and his conviction is against the weight of the evidence; (2) that portions of Clarissa's testimony deprived him of a fair trial; and (3) that the trial court's limiting of defense counsel's cross-examination rose to the level of a confrontation clause violation. As is discussed below, all of Foster's claims are without merit. Accordingly, the petition is denied in its entirety.

**1. Burden of Proof Claim**

Foster argues that the prosecution failed to meet its burden of proof beyond a reasonable doubt at trial, and as such, his conviction is against the weight of the evidence, attacking pieces of evidence presented over the course of the trial. (See Pet. at 35-43.)

On direct appeal, the Second Department rejected this claim and found that "[v]iewing the evidence in the light most favorable to the prosecution . . . [the court] conduct[ed] an independent review of the weight of the evidence . . . accord[ed] great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor." Foster, 143 A.D.3d at 736.

As a threshold matter, to the extent Foster raises a weight of the evidence claim, it is well established that a "weight of the evidence" claim is based solely on state law. See Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). This Court cannot review a purely state law claim on federal habeas review. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law…"). Thus, the Court cannot consider Foster's weight of the evidence claim, but proceeds to address his claim that his conviction was based on insufficient evidence such that the prosecution failed to meet their burden of proof at trial.

Regarding the sufficiency of the evidence claim, it is well-settled that a petitioner "bears a very heavy burden" when attacking the legal sufficiency of the evidence in an application for a writ of habeas corpus. Einaugler v. Supreme Court of the State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997) (quoting Quirama v. Michele, 983 F.3d 12, 14 (2d Cir. 1993)). The Court will not reverse a state court conviction if, "after viewing the evidence in the light most favorable to the

prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original); <u>see also</u> <u>Policano v. Herbert</u>, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilty beyond a reasonable doubt") (quoting <u>Jackson</u>, 443 U.S. at 324); <u>Ponnapula v. Spitzer</u>, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.").

The Court notes that "[w]here there are conflicts in the testimony, [a federal court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." <u>United States v. Ware</u>, 577 F.3d 442, 447 (2d Cir. 2009). This is because the task of assessing witness credibility rests solely with the jury, and "the jury is free to believe part and disbelieve part of any witness's testimony." <u>Id</u>. (citing <u>United States v. Josephberg</u>, 562 F.3d 478, 487 (2d Cir. 2009). "These principles apply whether the evidence is direct or circumstantial." <u>Id</u>.

When evaluating a sufficiency of the evidence claim, "[a] federal court must look to state law to determine the elements of the crime." <u>Quartaro v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999). As discussed above, Foster was convicted of one count of Manslaughter in the First Degree and one count of Endangering the Welfare of a Child. According to the New York State Penal Law, "[a] person is guilty of manslaughter in the first degree when . . . [b]eing eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of seriously physical injury to

such person and thereby causes the death of such person." N.Y. Penal Law § 125.20(4). Serious physical injury means "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). In addition, "[a] person is guilty of endangering the welfare of a child when [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." N.Y. Penal Law § 260.10(1).

In the instant petition, Foster contends that, inter alia, the following evidentiary deficiencies amounted to insufficient evidence to support his conviction: (1) the blood evidence only showed that Jonathan's blood was on the personal items, but failed to identify his killer; (2) Foster's phone call to LaRosa failed to establish he was the perpetrator; (3) law enforcement ignored Barbara—who had bipolar manic depression and access to Jonathan at the same time as Foster; (4) Jonathan Foster testified that, on October 12, 2011, Barbara told him "I hear voices that are telling me to kill, kill, kill"; (5) Foster's lack of emotional response was not proof of guilt; (6) Delores Welch's testimony lacked probative value as she did not observe Barbara interact with Jonathan and did not have information regarding Clarissa's violent outburst towards emergency workers upon the death of her son; and (7) Dr. Caplan could not identify when the injuries to Jonathan occurred. (See Pet. at 39-42.) In sum, Foster argues that "[t]he people had no eyewitnesses, no confession, and no forensic evidence which linked him to the crime." (Pet. at 39.)

As part of his sufficiency challenge, Foster also argues that Stalhut's information contradicts the evidence presented at trial and that the trial court disregarded the findings made in

a parallel Family Court proceeding. However, neither of these points have any relevance to Foster's sufficiency challenge.[14]

Ultimately, Foster takes issue with the conclusions drawn by the jury regarding the evidence at trial. However, when considering the evidence as a whole and the trial record in its entirety, the Court does not find that no reasonable juror could have come to a conclusion of guilt. The jury was entitled to credit the testimony of the witnesses at trial, which included civilian witnesses, members of law enforcement involved in the investigation, and expert witnesses. Based on the medical examiner's testimony, a reasonable jury could find, beyond a reasonable doubt, that Jonathan died from "blunt impact to the head, with fractures of the skull and injuries of his brain." (Tr. 820.) The remaining question was who did this to Jonathan. The jury could have credited Clarissa's testimony and concluded that she did not inflict this injury on Jonathan. That left only Foster and Barbara as the potential suspects. And, there was sufficient circumstantial evidence from which a jury could find, beyond a reasonable doubt, that Foster was responsible for Jonathan's injuries and death and was guilty of Manslaughter in the First Degree and Endangering the Welfare of a Child. As discussed above, Foster's conviction was based on circumstantial evidence that included: (1) medical testimony that established numerous injuries to Jonathan, with blunt force trauma being the ultimate cause of death; (2) prior to Foster's return to Jonathan's life,

---

[14] As part of his sufficiency challenge, Foster relies on Stalhut, asserting that "Barbara Hertzler's best friend wrote a letter to the Suffolk County District Attorney's Office after she admitted her daughter had killed the infant, and noted that Clarissa, not [Foster], was the last person with the infant boy." (Pet. at 40.) In addressing Foster's claim that his guilt was not proven beyond a reasonable doubt, the Court is only concerned with the evidence presented at trial. Since Stalhut did not testify at trial, and her conversation with Barbara was not part of the evidence at trial, Stalhut is irrelevant for the purpose of determining petitioner's sufficiency claim. As Respondent points out, Foster has not raised any claim challenging the state court's denial of his 440.10 motion concerning Stalhut.

Foster's sufficiency challenge also references findings made by the Family Court. As explained infra, the third claim in Foster's habeas petition alleges that the trial court erred in excluding findings made by the Family Court. Since those findings were not admitted at trial, they are irrelevant to Foster's sufficiency challenge. Moreover, as explained infra, the trial court's exclusion of the Family Court's findings did not violate the Confrontation Clause and was certainly neither contrary to or an unreasonable application of federal law.

no injuries were observed by visiting nurse Delores Welch; (3) once Foster moved into the home, Jonathan sustained injuries; (4) Foster conceded that he woke up to care for Jonathan between 2:30 a.m. and 3:00 a.m. on the night in question; (5) Foster was the last person to interact with Jonathan before his death; (6) LaRosa testified that Foster called him at 5:30 a.m. saying Jonathan was blue and not breathing; (7) despite LaRosa telling Foster to call to 911, Foster did not do so and instead waited until Clarissa woke up approximately seventy minutes later to say anything about Jonathan's condition; (8) Foster provided conflicting accounts of the causes of Jonathan's injuries; and (9) law enforcement investigated and excluded both Clarissa and Barbara as Jonathan's killer. The Court acknowledges that the conviction was based solely on circumstantial evidence, but "[g]uilt beyond a reasonable doubt may be established entirely by circumstantial evidence, and this evidence must not be reviewed piecemeal, but rather as a whole." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (internal citations omitted).

It is well established that "[f]ederal habeas courts are not free to reassess fact-specific credibility judgments by juries or to weigh conflicting testimony . . . On collateral review [the] Court must presume that the jury resolved any questions of credibility in favor of the prosecution." Anderson v. Senkowski, No. CV-92-1007 (CPS), 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992) (internal citations omitted). The Court cannot adopt Foster's interpretation of the evidence, where the finding of guilt, beyond a reasonable doubt, was a fair inference for the jury to draw. Accordingly, Foster has not met his burden to establish that no reasonable juror could have convicted him based on the evidence presented over the course of the trial. Therefore, this claim is denied.

### 2. Improper Witness Testimony Claim

Next, Foster contends that he was denied his right to a fair trial when Clarissa "invaded the province of the jury . . . by rendering an opinion . . . that [Foster] had killed the infant, even though she had no proof and, in any event, this was the ultimate question of fact for the jury to decide." (See Pet. at 44.) The Second Department denied this claim summarily on the merits. Accordingly, giving this determination deference under AEDPA, the Court finds that Foster has not established that the state court's rejection of this claim was contrary to or an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence at trial.

For context, the following portions of the underlying trial transcript are at issue for purposes of this claim:

| | |
|---|---|
| Mr. Besso (Defense Counsel): | . . . unfortunately the baby passes away and then - - |
| Clarissa Hertzler: | Not passes away. <u>He was killed</u>. |
| Mr. Besso: | That is something for the jury to make a determination, okay? . . . Can we strike that answer, please, your Honor? |
| Ms. Brown (The Prosecution): | Objection, argumentative. |
| The Court: | It is argumentative. Sustained. Let's move on. |

(Tr. 596 (emphasis added).)[15]

| | |
|---|---|
| Ms. Brown: | Why did you want the relationship to end? |
| Mr. Besso: | Objection. What difference does it make, judge? |
| The Court: | Subject to connection, I'll allow it. |

---

[15] The Petition concedes that the trial court sustained defense counsel's objection to Clarissa's testimony. (Pet. at 30.)

| | |
|---|---|
| Clarissa Hertzler: | Because of Jonathan. |
| Ms. Brown: | Why? |
| Clarissa Hertzler: | <u>Because something wasn't right.  He knew</u>. |
| Mr. Besso: | Objection to her speculation, your Honor.  This is all speculation. |
| Ms. Brown: | It is not speculation.  She's in the relationship. |
| The Court: | She's talking about her reasons for the break-up. |
| Mr. Besso: | What does a break-up have to do with a murder trial? |
| The Court: | I'm going to allow this.  It goes to her state of mind. |

(Tr. 509-10 (emphasis added).)

| | |
|---|---|
| Ms. Brown: | And once you learned from the medical examiner, the extent of his injuries, what did you do? |
| Clarissa Hertzler: | Basically, I had a nervous breakdown.  To see your own son, okay?  I saw all the autopsy pictures.  I saw autopsy pictures, I saw everything.  <u>I couldn't wrap my head around how he could do that</u>. |
| Mr. Besso: | Objection, judge. |
| The Court: | Sustained. |

(Tr. 510-11 (emphasis added).)

| | |
|---|---|
| Ms. Brown: | Did you have concerns about leaving Jonathan with the defendant? |
| Clarissa Hertzler: | Yes. |
| Ms. Brown: | What were your concerns in that regard? |

| | |
|---|---|
| Mr. Besso: | Objection, judge. |
| The Court: | Grounds. |
| Mr. Besso: | That's not a part of direct examination. Beyond the scope. |
| The Court: | Overruled. I'll allow it. It's not beyond the scope. |
| Clarissa Hertzler: | <u>I never thought that he would kill him or hurt him</u>. |
| Mr. Besso: | Objection, judge. |
| The Court: | Overruled. |

(Tr. 614 (emphasis added).)

It is well-settled that even "an incorrect state court evidentiary ruling does not rise to the level of constitutional error necessary to warrant habeas relief, unless the error deprived [p]etitioner of a fundamentally fair trial." <u>Alfini v. Lord</u>, 245 F. Supp.2d 493, 499-500 (E.D.N.Y. 2003) (citing <u>McLean v. McGinnis</u>, 29 F. Supp. 2d 83, 93 (E.D.N.Y. 1998)); <u>see also</u> <u>McKinnon v. Superintendent, Great Meadow Corr. Facility</u>, 422 F. App'x 69, 73 (2d Cir. 2011) ("[U]nless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable in [the context of a habeas petition.]") "Such unfairness will only result where: '[T]he erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, [and] highly significant.'" <u>McKinnon</u>, 422 F. App'x at 73 (quoting <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985) (internal quotation marks omitted)).

The Court has reviewed the underlying record in its totality and concludes that Foster has not established that any of the above statements deprived him of a fair trial. Certainly, the state court's denial of this claim was neither contrary to or an unreasonable application of federal law or an unreasonable determination of the facts.

As an initial matter, for two of the statements, the trial court actually sustained defense counsel's objections to the challenged testimony. Although Foster claims that the trial court should have issued curative instructions at that time, defense counsel never sought such instructions for any of the statements at issue. Moreover, the trial court's final instructions to the jury informed them that "[t]estimony which was stricken from the record, or to which an objection was sustained, must be disregarded by you," (Tr. 1018.), and jurors are presumed to follow the court's instructions. Cf. Greer v. Miller, 483 U.S. 756, 767 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be "devastating" to the defendant.") (citations omitted). In any event, even if the jury disregarded those instructions and considered this evidence, the potential prejudicial impact of these two statements did not deprive Foster of a fair trial.[16]

As to the two disputed pieces of testimony where the trial court overruled Foster's objections, that testimony did not deprive Petitioner of a fair trial. First, Clarissa testified about her reasons for breaking up with Foster, stating "[b]ecause something wasn't right. He knew."

---

[16] Clarissa's statement that Jonathan was "killed" did not deprive Foster of a fair trial. This statement—which was made in response to defense counsel's statement that Jonathan merely "passed away"—did not explicitly implicate Foster as the killer. Moreover, any prejudicial effect of this testimony was minimal in light of the medical examiner's testimony that Jonathan died from a blunt impact to the head. It is also notable that prior to making this statement, Clarissa had previously testified—without objection from defense counsel—that "my son was killed." (Tr. 570.)

That testimony, which concerned Clarissa's subjective belief about Foster, was admissible because it was relevant to explain why she broke up with him.[17]  Second, Clarissa's statement that "I never thought that he would kill him or hurt him" could, in one light, be seen, as helpful to Foster's defense.  In any event, even if the jury construed this statement in a manner that was unfavorable to Foster, it did not deprive him of a fair trial.

Finally, even if all four of the disputed statements are considered cumulatively, Foster was not denied a fair trial.  In light of all the evidence at trial, these four speculative statements from Clarissa were not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Foster certainly cannot show that, in rejecting this fair trial claim, the state court's decision was contrary to or an unreasonable application of federal law or an unreasonable determination of the facts.[18]

Thus, for the reasons set forth above, the Court denies Foster's fair trial claim.

---

[17]  The fact that the "He knew" comment was properly before the jury weakens Foster's claims that the other three comments, which expressed similar sentiments, were so prejudicial that they deprived Foster of a fair trial.

[18]  In his petition, Foster suggests that the trial court's alleged errors concerning the admission of Clarissa's testimony were particularly prejudicial because, according to Foster, the trial court precluded defense counsel from introducing evidence that Barbara believed that Clarissa had killed Jonathan.  (Pet. at 35.)  This argument is meritless.

It appears that one of Barbara's mental health treatment records indicates that Adrienne Hertlzer—Clarissa's sister who was not present on the night of October 11, 2011—believed that Clarissa murdered Jonathan and that Barbara started believing this as well.  (Tr. 21-22.) The prosecution filed a motion in limine to preclude defense counsel from inquiring into this and other topics related to Barbara's mental health treatment.  (Tr. 21.).  The trial court denied the prosecution's motion and explicitly stated that the defense would be allowed to cross examine Barbara about her mental health history.  (Tr. 25.)  Thus, contrary to Foster's claim, it does not appear that the trial court precluded the defense from inquiring into these statements by Barbara, who was never called to the stand.  Moreover, even if the trial court did preclude the defense from introducing these statements, the trial court would have had ample grounds to do so and the exclusion of any such statements would not establish that the disputed statements made by Clarissa deprived Foster of a fair trial.

Finally, Foster suggests, in passing, that Stalhut's testimony has some relevance to his fair trial claim concerning Clarissa's testimony.  (Pet. at 35.)  Stalhut, however, did not testify at the trial and, as noted previously, Foster has not raised any claims in his habeas petition challenging the state court's denial of his § 440.10 motion concerning Stalhut.

### 3. Confrontation Clause and Due Process Claims Concerning Family Court Findings

Foster contends that he is entitled to habeas relief because the trial court erred by precluding defense counsel from cross-examining Clarissa regarding a family court abuse petition and the Family Court's ultimate finding of abuse against her. (See Pet. at 51-60.) Foster argues that the trial court's preclusion of this cross-examination deprived him of "both his Sixth Amendment right to confrontation, and his Fourteenth Amendment due process right to a fair trial." (Pet. at 51.) Respondent asserts that these claims are procedurally barred. It is unnecessary to determine whether these claims are procedurally barred because they fail on the merits.

#### i. Factual Background for These Claims

Prior to Foster's criminal trial, the state brought, in Family Court, an abuse and neglect petition against both Clarissa and Foster stemming from Jonathan's death. The petition alleged that the Clarissa and Foster, "while responsible for the care, supervision, and guardianship of Jonathan Hertzler . . . inflicted physical injury by other than accidental means, which caused [his] death." (Family Court Order at 1.) The Family Court found the abuse petition against Clarissa and Foster was established. (Id. at 8.) In these family court proceedings, both Clarissa and Foster invoked their right not to testify under the Fifth Amendment and the Family Court drew negative inferences against them based on their failures to testify. (Id. at 2.)

Prior to trial, the prosecution moved, in limine, to preclude defense counsel from questioning Clarissa about the Family Court proceeding. Foster filed a letter opposing that motion, arguing that the Confrontation Clause entitled him to question Clarissa about the Family Court's findings.

The trial court addressed the Family Court hearing at the start of the trial:

Ms. Brown
(The Prosecution):     . . . Is Mr. Besso agreeing that he is not intending to cross-examine anyone in this trial, about a family court finding against Clarissa Hertzler, or a CPS finding against Clarissa Hertzler?

The Court:     When you say "family court finding," you're talking about Judge Freundlich's decision?

Ms. Brown:     I am.

The Court:     Mr. Besso?

Mr. Besso
(Defense Counsel):     Am I getting examined judge?  I don't understand.  I thought Ms. Brown was going to make an argument of some sort.

The Court:     I'm not allowing reference to Judge Freundlich's finding.

Mr. Brown:     All right.  So then.

The Court:     That's a civil proceeding, and I'm not permitting that.

Ms. Brown:     Okay.

The Court:     Yes.

Ms. Brown:     So the fact that the witness cannot be cross-examined about the family court finding, it is therefore the people's understanding Mr. Besso's intent is once Clarissa Hertzler takes the stand, to ask her, isn't it true that when you were asked in a prior proceeding if you killed the baby, your answer was, I plead the fifth.  Sum and substance, is that - -

The Court:     Yes, I'm allowing inquiry on that.  However, I will be also issuing a curative instruction.  And this is pursuant.  Both sides have been provided with the relevant case law, to a court

36

of appeals case, <u>People v. Ashby</u>. That is a court of appeals decision and it is directly on point. I will be giving a curative instruction to the jury that the question goes to the witness' credibility, only, and that they are to draw no additional inference other than that.

(Tr. 25-27.) The prosecution proceeded to argue that the questioning regarding the Family Court proceeding would cause insurmountable prejudice to the prosecution, notwithstanding a curative instruction. (Tr. 29.) Defense counsel responded by stating that the above-mentioned court ruling was correct. (Tr. 32–34.) The trial court ultimately stood by its ruling. (Tr. 32-34.)

During the trial, pursuant to the trial court's ruling, Clarissa's was cross-examined regarding the Family Court proceeding:

| | |
|---|---|
| Mr. Besso: | Now, sometime after the baby passed away, Jonathan passed away, there was a hearing regarding his death, do you remember that? |
| Clarissa Hertzler: | Yes. |
| Mr. Besso: | And that was, at the time, that you invoked your 5th amendment rights not to testify? |
| Clarissa Hertzler: | Yes. |
| Mr. Besso: | And you did that because you were afraid that if you testified that you would be charged with a crime? |
| Clarissa Hertzler: | No. |
| Ms. Brown: | Objection. |
| The Court: | Sustained. That last question and answer are to be stricken from the record. |
| Mr. Besso: | But you did assert your 5th amendment right, is that correct? |
| Clarissa Hertzler: | Yes, I did. |

| | |
|---|---|
| The Court: | Ladies and gentlemen, at this point, let me give you a curative charge. This was at a prior proceeding not even in this court. And this question, and Ms. Hertzler's answer, goes strictly to her credibility and not to anything more than that. All right? I suspect that you gave that response under advice of counsel, is that correct? |
| Clarissa Hertzler: | Yes, that is correct. |
| The Court: | Thank you. So her response is for that limited purpose only, for your evaluation as to her credibility. |

(Tr. 527-29.)

### ii. Procedural Bar

Foster raised this claim on direct appeal and the Second Department found that he had "failed to preserve for appellate review his contention that he was deprived of his constitutional right to confront witnesses against him and thereby to present a defense in reference to a prior Family Court finding . . . and we decline to reach the issue in the exercise of our interest of justice jurisdiction." Foster, 143 A.D.3d at 736.

Based on this determination, Respondent maintains that this claim is procedurally barred from habeas review because, according to Respondent, Foster failed to raise a contemporaneous objection to the trial court's limiting of the cross-examination regarding the Family Court findings. (See Resp.'s Br. at 45-46.) Foster argues that the Second Department's determination that this claim was unpreserved is erroneous because, prior to trial, defense counsel filed a letter objection to the prosecution's pre-trial motion *in limine* that sought to preclude defense counsel from cross-examining Clarissa about the Family Court's abuse finding. (See Pet. at 58-60.) It is ultimately unnecessary to determine if Foster's claims are procedurally barred because, as explained below, they fail on the merits.

*iii. Foster's Confrontation Clause and Due Process Claims Fail on the Merits*

The Supreme Court has instructed that pursuant to the Confrontation Clause, a petitioner is entitled to "a meaningful opportunity to cross-examine witnesses against him." Brinson v. Walker, 547 F.3d 387, 392 (2d Cir. 2008) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987)). However, "[t]he Confrontation Clause does not, however, guarantee unfettered cross-examination." Alvarez v. Ercole, 763 F.3d 223, 230 (2d Cir. 2014). It is accepted that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). It is within the discretion of the trial court when "determin[ing] the propriety of cross-examination . . . [to] balance prejudice versus probative value." Watson v. Greene, 640 F.3d 501, 510 (2d Cir. 2011).

"Combining the standard for restricting cross-examination with the AEDPA standard, in order to grant [a] habeas petition [the federal court] would have to conclude not only that the trial court abused its 'broad discretion' by precluding cross-examination. . . but also that the [state appellate court] could not reasonably have determined that the [evidence] would have been excludable had the trial court properly applied 'standard rules of evidence.'" Id. (quoting Wade v. Mantello, 333 F.3d 51, 62 (2d Cir. 2003)); see Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (explaining, in the context of claim that the defendant was denied the right, under the Sixth and Fourteenth Amendments to present a defense, that "if the evidentiary ruling was correct pursuant to a state evidentiary rule . . . [the habeas court only considers] whether the evidentiary rule is arbitrary or disproportionate to the purposes [it is] designed to serve." (citations and internal marks omitted)). Further, to grant habeas relief based on a trial court limiting the cross-

examination of a witness, "the trial court's denial must not have been harmless, that is, it must have had a substantial and injurious effect or influence in determining the jury's verdict." Alvarez v. Ercole, 763 F.3d 223, 230 (2d Cir. 2014) (internal quotation marks and citations omitted).

Foster contends that the trial court improperly precluded the cross-examination regarding the Family Court petition and finding.

As an initial matter, although the Second Department did not address the merits of Foster's Confrontation Clause claim because it found the claim to be procedurally barred, the trial court rejected this claim on the merits. Accordingly, the trial court's rejection of this claim on the merits is presumably entitled to AEDPA deference. In any event, even if de novo review were applicable, Foster's Confrontation Clause claim would still fail.

The trial court's limitation of Clarissa's examination here was not a Confrontation Clause violation and, certainly, was neither contrary to or an unreasonable application of federal law.

The trial court's ruling was not incorrect under New York's evidentiary rules. Nor can Foster show that the application of New York's evidentiary rules here "was arbitrary or disproportionate to the purposes" they are designed to serve.

Allowing Clarissa to be questioned about the Family Court's ruling could have potentially confused the jury. In Family Court, Suffolk County only had to establish abuse by a preponderance of the evidence and the Family Court drew adverse inferences against both Clarissa and Foster for invoking their Fifth Amendment rights not to testify.[19] (See Family Court Order at 2, 6.) Moreover, the Family Court's finding against Clarissa had marginal probative value given that the

---

[19] In his habeas petition, Foster maintains that he had no issue with the jury hearing that the Family Court also found, based on his own invocation of the Fifth Amendment, that he was similarly responsible for Jonathan's death. However, allowing the jury to hear that Foster had invoked his Fifth Amendment right at the Family Court proceeding—an invocation that was held against him in that proceeding—would have added another layer of complexity and potential confusion to the criminal trial.

Family Court did not even hear critical evidence introduced at the criminal trial—namely, Clarissa's own testimony.  Additionally, Foster was able, through other lines of questioning, to attack Clarissa's credibility and to paint her as potentially the responsible party in Jonathan's death.  The trial court even allowed Foster to elicit the fact that Clarissa invoked her right not to testify in a proceeding about Jonathan's death, which gave Foster a powerful tool to impeach Clarissa' testimony.  In sum, the trial court had ample reason to preclude questioning about the Family Court's finding and there was no Confrontation Clause violation here.  See United States v. Holloway, 826 F.3d 1237, 1247 (10th Cir. 2016) (finding no Confrontation Clause violation where district court precluded defendant from asking prosecution witnesses about default judgments that had been entered against them in civil proceedings because that evidence could have potentially caused juror confusion and defendant was able to "establish, through other lines of questioning, everything he wanted with the default judgments—the witnesses' bias, lack of credibility, and active roles in the fraudulent scheme"); Watson, 640 F.3d at 511 (rejecting habeas claim based on alleged Confrontation Clause violation because the "trial judge could reasonably accord substantial weight to the possibility that a jury would be confused by the admission of [the] hearsay statement" at issue and the petitioner was able to explore the issue of the police investigation's thoroughness through other means during cross-examination).

Foster claims that the Family Court's ruling would have shown that Clarissa had a motive to fabricate her testimony in order to "exonerate her[self] and protect her mother." (Pet. at 41.) However, even absent the Family Court proceeding, Clarissa already had a powerful motive to lie in order to shield herself from criminal prosecution.  Allowing questioning concerning the Family Court's ruling would have added little, if anything, in this regard.  Moreover, with respect to Foster's claim that Clarissa had a motive to protect her mother, the Family Court ruling did not

even contain any adverse findings concerning Barbara.  In fact, the Family Court explicitly ruled that Barbara was not Jonathan's caretaker and did not have access to Jonathan on the night in question.  (Family Court Order at 4.)

Furthermore, although the defense tried to show at trial that Clarissa did not take Jonathan to the doctor because she feared Child Protective Services being alerted, Foster could adequately advance this argument without exploring the later Family Court petition and the Family Court's findings.

Foster also stresses that questioning about the Family Court's ruling was critical because, according to Foster, a reasonable juror would have concluded that if the Family Court had found that Clarissa killed her son, "it may very well be true."  (Pet. at 43.)  As explained above, the trial court was well within its discretion to preclude Foster's attempt to introduce the Family Court's ruling in order to establish that Clarissa had, in fact, abused Jonathan and was responsible for his death.  The Family Court's ruling was likely to cause jury confusion and also had marginal probative value as Clarissa did not testify in Family Court.

Accordingly, the trial court's restriction on Clarissa's cross-examination did not violate the Confrontation Clause and certainly was neither contrary to or an unreasonable application of federal law.

In his habeas petition, Foster also argues that the trial court erred when it precluded Foster from questioning Clarissa about the abuse and neglect petition that was filed against her in Family Court.  This claim may be unexhausted.  Foster's brief to the Second Department focused on the trial court's refusal to allow questioning about the Family Court's findings, not on the Family Court petition itself.  In any event, this argument is plainly meritless.  There was little additional probative value in allowing questioning about the abuse petition itself.  Notably, even Foster's

habeas petition never explains why questioning concerning the abuse petition itself would have been critical to his defense—instead, all of Foster's arguments focus on the alleged importance of the Family Court's findings. Moreover, Foster had ample other evidence to attack Clarissa' credibility and Foster had the ability, at trial, to explore the evidence underlying both the abuse petition and the Family Court's ultimate findings. Any preclusion of questioning about the abuse petition would not have violated Foster's confrontation rights.

Finally, Foster also claims that trial court's ruling that prevented him from exploring the abuse petition and the Family Court's finding during Clarissa's cross-examination violated his rights under the Fourteenth Amendment to due process and a fair trial. It seems doubtful that Foster adequately raised this claim in state court for purposes of exhaustion. (See Def.'s App. Br. at 43–44 (mentioning both Sixth and Fourteenth Amendments, but indicating that the Fourteenth Amendment was only relevant to this claim because the Sixth Amendment applies to the states through the Fourteenth Amendment).) As such, this claim, which had to be brought on Foster's direct appeal, would likely now be found procedurally barred. See Dominguez v. Rock, No. 12-CV-3269, 2016 WL 542120, at *5 (E.D.N.Y. Feb. 9, 2016). In any event, this claim is plainly meritless and fails for the same reasons that Foster cannot prevail on his Confrontation Clause claim.

### III. CONCLUSION

For the reasons stated above, Foster's petition is DENIED. A certificate of appealability shall not issue because Foster has not made a substantial showing that he was denied a constitutional right. See 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: October 4, 2019
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE